2-17-1012, 1West Bank, North America, N.A. v. Chicago Title & Trust Company at L. McBenney's Palace. On behalf of McBenney's Palace, Mr. James D. McBenney, and on behalf of N.A.V., Ms. Dina Valterra. You may proceed when you are ready. Good morning, Your Honors. My name is James Gedini. I represent the appellate, Ophelia Starkman, in this matter. Ms. Starkman is also my mother-in-law. I'd like to start off that this is the first time I ever did an appellate argument, and my litigation experience is pretty limited. Did you tell your mother-in-law that? No, I did not. So please bear with me. I don't know if I'm going to make a Clarence Darrell performance here today, but I'll do my best to explain the situation to all of you this morning. This is a reverse mortgage foreclosure action brought against the appellate. The court below entered a summary judgment for the plaintiff on April 26, 2017. We believe the lower court erred in granting the summary judgment because there are genuine issues of material fact remaining. In Rausner v. Field Enterprises, Inc., the Illinois First District Appellate Court said, summary judgment should not be granted unless the moving party demonstrates a right to a judgment with such clarity as to leave no room for controversy. As is evident from the brief's file, there remains controversy and significant questions of fact. The main issue of fact here is whether Ms. Starkman should be considered a borrower on the reverse mortgage. I do have a statement of facts, but I listened to a few of your audios on mine, and I know that you guys usually don't want to listen to the statement of facts, so I'll just go into my arguments. Let me ask you a few things before you get started. There was a summary judgment motion filed, as you said, and you had an opportunity to respond to the summary judgment, and you raised a lot of issues on appeal like lack of consideration, the reverse mortgage is invalid, the intent of the parties. A lot of those issues you never raised down below, and you never raised them in response to a summary judgment. Why should they not be forfeited here at the appellate court? Basically, we had two separate counsels. Our first counsel was Mr. Cathles, and there were some issues with him in court. One of the motions that was filed, he did not appear, and then he did not respond to the motion later. And then when he was let go, a colleague of mine, Adam Mergenthaler, took over the case, and he took all the issues and briefed him as best he could and tried to resurrect what was remaining of the case in the summary judgment. And I believe since in the appellate court, they reviewed this de novo, that we should be able to bring these issues in front of you today. Without your opponents having the opportunity to address them down below? Your Honor, again, I believe that's just one of those situations that was beyond my control. Let me ask you about the mortgage. Where you raised that the mortgage didn't reflect the identity of the buyer. Talk to us about that. The borrower? The borrower, excuse me. Talk to us about that argument at this point. All right. Hold on a second. You did raise that in the response to the summary judgment. Right. Yes. As well as the answer that was raised in the answer to this point. Yes. Here's my answer to that. Ms. Starkman's clearly believed that they were both afforded the right to live in the marital home until their deaths. Ms. Starkman's affidavit clearly states that they were told on numerous occasions that both Irving and Ophelia would be co-borrowers on the financial freedom reverse mortgage and that if one or either of them died while they were still living in the home, the other spouse would not have to repay the mortgage and that he or she would be able to remain in the home until his or her death. Where an attachment is a contract or other instrument, the proper construction of the contract is a matter of law. That's Gallagher versus Leonard. The primary objective in construing a contract is to give effect to the intent of the parties. The language of a contract given in its plain language and ordinary meaning is the best indication of the party's intent. So how about Section 24 in the contract where it said, I hereby release and waive all rights under and by virtue of the Illinois homestead exemption laws. Is that pretty clear? Your Honor. I mean, if you're looking at the contract being the intent of the parties. Well, I'm just going to go on a little bit with this. Yes, sir. Moreover, because of the words derived from their meaning, from the context in which they are used, a contract can be construed as whole, viewing each part in the light of others. Here, it's illogical to assume that the sick and elderly Irving Starkman would execute an agreement depriving his wife and family of their ability to maintain their residence in the marital home. It is further illogical to believe that it would be the intent of Ms. Starkman to deprive herself or her rights in the marital home, and her affidavit contains clear and convincing evidence that she had no such intention. So basically, she relied on this representative, and she signs the contract based on his presentation, and I've stated in the brief that I was present there when he was telling them over and over that she's going to be able to remain in the home after her husband passes away, and the house is going to be there until she passes away, and then they'll take the home. And I was there for... Did you look at the contract? I did not look at the contract. I did not. My mother-in-law and my father-in-law didn't ask me to get involved. There's 12 other kids involved with this family, and if I get involved, oh, my God. You know, we get to question that. Yes, very much. That's why I didn't get involved. Don't we have to look, though, at the language of the contract? Yes. Unless there's some ambiguity. Yes, yes, but I think the circumstances here, I mean, I'm in front of three judges, and just being a witness to this, I'm not going to lie to three judges of what they did and how they presented themselves. Did you raise a fraud count? Yes, I did. We did raise a fraud count in the court. Wasn't that one of the counts that was dismissed and never replied, though? Mm-hmm. It was, again, it was with Mr. Cathalas, and it was like he vanished. So I, you know, I was, and we had to replace him. So, you know, the counts were brought up. We did the best we could, and there was a motion to dismiss, but it didn't go through. No, you talked also, you said about the intent of the parties. The terms of the contract are clear in this that the intent of the parties in a contract are presumed based upon the terms of the contract, correct? Mm-hmm. I think you said that. The plain language in this contract was that Irving was the sole borrower, and that was also represented, I think, on two loan applications and on some disclosure forms over and over again. So it was defined in the note he was always defined as a quote-unquote sole borrower. How do we get past that? She signed as a non-borrower in the non-borrower certification. How do we get, as a trial, as a court, how do we get past that? How do we find that the trial court erred in construing the language, the plain language of this contract? Well, the contract is, to me, there was no meeting of the minds. The intent of the contract was for Ms. Starvin to remain in the home, and if you don't have a meeting of the minds, you've got a corroboration of her testimony in an affidavit, and you've got my corroboration being present there. But you have a contract. So is non-reading the contract, how can you complain about not reading the contract? I mean, if we have a contract, we can't go outside the four corners of that contract, can we? Unless maybe we have a fraud count. That's what I'm stating. Again, it's go over and over, and that's, like I said, that's what I witnessed, and I was present there. Right. And I have absolute sympathy for the whole situation, and that's why I'm asking you. I mean, it's a sad situation, but how do we, as an appellate court, disregard or find that the trial court abused their discretion on any level on a standard of review? How do we reverse the trial court? Tell us how we reverse the trial court. What's your suggestion? My suggestion is there is a general insurance material back that would be the fraud claim. But you don't have a fraud claim. Do you? You have a fraud claim that was dismissed, and you were given leave to refile, and it was never refiled. So we don't have a fraud claim. That's what I'm saying to you. What other way can we reverse this trial court? Can I go back to my borrower's establishment here? Sure. Okay. I believe she's a borrower. Okay. I heard the mortgage representative repeatedly tell her she would be a borrower on the contract and that she would be able to remain in the home after Mr. Starkman passed away. Mrs. Starkman was not listed as a borrower on the note, but her signature appears under the borrower's section at the bottom of the mortgage under her husband's name. So I've got confusion here with these documents. Is the contract ambiguous? I believe it is. To be honest with you, I had the contract looked at by some friends of mine that are underwriters, and they couldn't even make heads or tails out of it. It goes back and forth. She's on the mortgage. She's not on the mortgage. She's not a borrower. She is a borrower. But I'm just going to keep on going with this. At all times before the execution of the mortgage on the note, I tell her death, his death. Mrs. Starkman was married to Mr. Starkman. Title of the home was listed as Irving Starkman or Theodore Starkman, the trustees of their successors in the trust. Irving Starkman and the trust were dated November 15, 2000. Mrs. Starkman was married to the borrower at the time of the execution of the mortgage on the note, and Mrs. Starkman signed the mortgage. No explanation if she was waiving her rights or joining the note. The mortgage document identifies Mrs. Starkman's name under her husband's name in the borrower's section and the borrower's signature and lines page 10. On the next page, Mr. and Mrs. Starkman's signatures were verified by Alijo Diaz, a notary public. Then on the bottom of the following page entitled Exhibit A, Legal Description of Property, both Mr. and Mrs. Starkman initially signed as borrowers. Mr. Starkman solely signed the accompanying no. One West has also recognized in their very own complaint, exhibits that Mrs. Starkman was a borrower on the mortgage. One West served Mrs. Starkman with a complaint of foreclosure mortgage. Incredibly, on page 1 under section 3C of One West's own complaint, Ophelia Starkman is listed as a mortgager under her husband's name. Also on One West's notice of intent to foreclose letter dated August 26, 2013, lists Starkman Ophelia as a borrower. Likewise, the grace period notice letter lists Starkman Ophelia as a borrower. Didn't Ophelia acknowledge that they met with legal and tax experts who told them that it was in their best interest to enter into a reverse mortgage with one spouse, having ownership interests in the property? No, I do not recall that. Didn't she also acknowledge that she understood and acknowledge that her spouse would, that the document said that if her spouse would pre-decease her, that would fail to be her residential property at that point? They did not explain that. What they explained to her, that she could remain there. I mean, that's the whole, now with the new laws in place, like I stated in our briefings, and under the Browner administration, the new Illinois reverse mortgage statute says, that was brought into January 1st of 2016. After this. Exactly. There's a cooling off period, and there's more education, and they give you more of an explanation of all the ups and downs with reverse mortgages, and the risks that you take. Do you want to give us the remedy you're seeking? Sure. Your Honors, we are requesting that you reverse and remand the lower court's decision, so we have a chance to have our case heard in front of a jury, or reverse the case in general. Thank you. Thank you, sir. We will have an opportunity to reply as well. Counsel, you prepared? Yes. Good morning, Your Honors. My name is Gina Belvatero. I represent the FLE in this case. I do want to start out by expressing our sympathy to Mrs. Starkman. Regardless of the legal issues here, she lost a husband, and she is in danger of losing her home, and we want to acknowledge the human aspect of that. Mr. and Mrs. Starkman decided in 2007 that it was in their best interest to take out a reverse mortgage loan. Now, the briefing from Mrs. Starkman asked a lot of questions about why would they have done this. Mr. Starkman was sick. It makes no sense that you would have made the Turing event for maturing that loan his death, and the answer is we don't know. We do know that at the time they had a mortgage on the property, and we know they had some IRS liens and some Illinois Department of Revenue liens, and it's possible that they were in danger of not being able to keep the property unless they did something like this. Now, the way that reverse mortgages work, and you all seem very well briefed, so I don't want to tell you something you already know, but the way that they work is it's based off of the age of the youngest borrower. So if you have a spouse with an age difference, they will look to the youngest borrower and divide based on their age the amount of money that they'll be able to get out as part of that reverse mortgage. And in this case, it clearly was to their benefit because Mr. Starkman was so much older, and they were able to get $756,000 out at the signing of the loan. Now, that money went in part to pay off about $540,000 worth of prior liens, including the mortgage and the tax liens, and they also took out around $200,000 in cash that no doubt were used for living expenses in Mr. Starkman's care. Now, he lived for several more years, and then when he ultimately passed, we find the situation here came to roost. Mrs. Starkman now was in a position where she had to make a decision if she could pay off the loan, if she could stay in the home, if she couldn't. They offered her some options to try to resolve it, like a deed in lieu and foreclosure or a short sale, and instead the property went to foreclosure. Now, you've raised some points about how some of the arguments have been waived here. The most important of that, at least from my perspective, is the idea that there was fraudulent inducement. That was raised initially as an affirmative defense. It was dismissed without prejudice, and they never sought leave to recede. And had they, we may have had a different set of facts and evidence in the record that we'd be talking about today, but the bottom line is they did not, and that may be an issue vis-a-vis that prior counsel, but it's not an issue that should inert to the detriment of my client in this case. The contracts themselves are clear. They're unambiguous, and you don't need to look beyond them to determine what the party's intended and what needs to be enforced here. Is there a discrepancy as to whether she signed also as a borrower on some different pages of the contract? So she signed two things. She signed the mortgage, and she signed a non-borrower spouse ownership interest certification. So with respect to the idea that she is labeled as a borrower on the signature line for the mortgage, if you look at paragraph 10 of the mortgage, it explains how that works. It says, anyone who co-signs the security instrument as a borrower but does not execute the agreement, which was the note, which she did not, is co-signing the security instrument only to mortgage, grant, warrant, and convey that borrower's interest in the property under the terms of the security instrument, is not personally obligated to pay the amount secured by the security agreement, and agrees that lender and any other borrower may agree, subject to applicable law, to extend, modify, forbear, or make any accommodations with regard to the terms of the security instrument or the agreement without borrower's consent. So in layman's language, that means what? In layman's language, that means even if you're called a borrower, and I think of that less as a legal term and more just a term that they use, the mortgage expressly contemplates that you have to also sign the note in order to be a true borrower under the terms of the agreement. So had she also signed the note, then she would have been able to stay in the home until her death or until she left the property. But because she did not also sign the note, that was not a triggering event. The triggering event was her husband's death. Isn't that confusing for older people? Those are the people who get reverse mortgages because they're older folks. Yeah. And, you know, I think we'd be remiss not to at least explore that as a general concept. You know, you have to have an attorney for a closing in Illinois, but you don't have to have an attorney for a reverse mortgage, which I think people, I mean, personally, are probably more vulnerable when it comes to that mortgage than they are in a closing. Well, I know, and, you know, the law has changed, as Mr. Gavini's brief points out. The law has changed to build in additional protections. And if you have a HUD-insured mortgage, there are additional. Right, which is the Bennett case. Yeah, the Bennett case, and then there's another case. How do you distinguish that? Yeah. Well, in the Bennett case, that's a HUD-insured mortgage. This was not. I'm sorry. This was not. This was not. And the HUD-insured mortgage has to be tied to both of the homeowners so that you don't end up in a situation like this. So if one spouse dies, the other spouse gets to stay on the property. That also impacts how much money you can get. Here, because of the size of the loan, it didn't meet the HUD limits. And so, unfortunately, Bennett v. Donovan doesn't apply here at all. However, even if it did, there's a distinction, right, between whether or not HUD violated HUD regulations by insuring a mortgage when that was not the case, when they didn't have both borrowers protected, and whether a lender can actually foreclose upon the property based on the written language of the contract. So here, even if it was a chief CM or HUD person, CIT could still have foreclosed. Yes. And that's actually spelled out very recently by the 11th Circuit in the estate of Caldwell-Jones, the Livewell Financial, where they looked at that obligation and said, even assuming that HUD insured the mortgage in violation of Section 1715Z-20J, lenders still had a private contractual right, independent of the statute, to demand immediate payment and, if necessary, pursue foreclosure. So it's not the remedy for getting borrowers in the situation of a contract, even if they do have a HUD-insured mortgage, unfortunately. How about consideration? What consideration did the wife get if she wasn't the borrower? She wasn't the borrower, but the lower court found she had direct consideration to her for giving up her rights. The $756,000 that they got at closing went partially in cash, which one would presume would be used to pay for common and joint household expenses, but more importantly to pay off liens that were encumbering the property for which she was a beneficial owner. That included a prior mortgage. It also included the tax liens that we discussed, and I think there was a small landscaping lien as well. So she did directly benefit from the transaction. But even if she didn't, the law is pretty clear here that you can have consideration and be a benefit to a third party. And here her husband, obviously the relationship exists that it wouldn't take much to inquire as to why a wife would put her own interests aside in order to have a benefit to a loved one. So it directly benefited Ophelia as well. And it did, yeah. And the court found both in rendering this decision. It is your position that there is nothing ambiguous about who was a borrower under this group of documents. That's correct, Your Honor. If you look at the list of documents, and you guys referenced this earlier, so she signed the two documents. The first document is the mortgage. The second one is this disclosure statement. And the disclosure statement is very, very clearly written. And they're both required to initial in multiple places that they understand, you know, the ability to have consulted with tax and legal experts relating to these issues. And at the very bottom of that page, it says, and this is just where she signs it, right? So it's very clear who this relates to. It's her. It's not Mr. Starkman. I understand, and by my execution of this document and initialing the boxes above, confirm the accuracy of each of the statements set forth above. In addition, I understand and acknowledge that should my spouse predecease me or fail to occupy the home where I resided as his principal residence, and unless another means of repayment is obtained, the home where I reside may need to be sold to repay reverse mortgage debt incurred by my spouse. If the home where I reside is required to be resold, I understand that I may be required to move from my residence. That language is extremely clear. And I don't view this as a bait and switch of two elderly people who had no idea what they were agreeing to. They were Mrs. Starkman was not very old. She was 64. Mr. Starkman may have been 75, I believe, at the time. But, you know, these are educated people that live in Highland Park. They've done well for themselves. They had lots of family members, a few of whom are attorneys. Mr. Godini acknowledges that he was not asked by his in-laws to review the documents, but he was present for some of these transactions. They could have consulted with him at any time if they didn't understand the documents. But the documents themselves are pretty clear about exactly what would happen, and you really need look no further than that document I just read, that certification. The remaining documents, though, also lend to the idea that Mr. Starkman was clearly the sole borrower. There are a number of them, including two loan applications, disclosure forms, the note itself, addendums, all of which were just signed by him and just identify him as the borrower. There's an estimated amortization schedule that he had to sign, and it identifies his age as 75, next to the line age of the youngest borrower, and then the amortization schedules are based off of his age, and it's incredibly important for a reverse mortgage. He also signed another document acknowledging that he was not taking out joint credit. It's very much clear that when you look at all of the documents that were presented at closing, that they tell one story, and that story was that they determined it was in their best interest at the time, maybe to save the house then, to use Mr. Starkman's age as the triggering age to get financing under the reverse mortgage. If the property was held in joint tenancy, would it be any different? No. The Joint Tenancy Act. So they are held as tenants by the entirety, which is essentially a joint tenant with the right of survivorship for spouses. Right. And I don't think that changes anything. You just need to have your interest encumbered and pledged, unfortunately. So even though the property, technically, it was held in trust, of which they were the beneficiaries, but it wouldn't have changed the fact that both she, Mr. Starkman, and the trust itself all executed the mortgage, which pledged all possible interests that those people or entities would have in that property. I'm happy to discuss this further, but I think we've hit most of the points. And so I'll wrap up by saying that the court's job, and this may be difficult, and the lower court acknowledged that it was difficult because we're not without sympathy as human beings, but the job is to enforce agreements as written. And here we don't inquire into whether or not it was a wise financial decision. And frankly, it may have been the only financial decision available to them at the time, but they did agree to the terms. And so we find ourselves at the end of the road of the inevitable conclusion of what those terms are. And the lower court got it right, and we ask that this court affirm. Thank you. Thank you very much. Counsel, do you wish to reply? Yes. Like what was brought up previously, that these agreements are very confusing to older people. I think one fact that was not brought up in both briefs, that my mother-in-law, her second language is English. She was born in the Philippines, and she lived there for 30 years. So you've got another added factor there. Is that in the record anywhere? I would have to look maybe in one of the affidavits, but it wasn't brought up before, and I'll just bring it up now. Again, I think the contract was ambiguous. She's listed as a borrower, she's not. And then you're relying on a representation from one of the representatives, Mr. Simpson, stating that she can remain in the home. And that representation and hounds are what brought her to sign the contract. Did she have other – were there liens on the property? Yes. But there was other options. There's other family members. There's 12 other kids. There's a – she's got a daughter in New York that is doing pretty well. Maybe they could have helped her with a lien if they would have had more information. The problem was back in 2007, these were – I know it's reverse mortgages starting in the 80s, but in 2007, in the early 2000s, there was a resurgence, and nobody really had a grasp on how they worked and what can happen in the downfalls if you've got a reverse mortgage. I did some resurgence stuff on the Internet, and I know that Citibank is getting rid of their division of financial freedom and they're getting out of the reverse mortgage business. I believe there's an article in Mortgage Weekly that said that they're selling off that part of their brand. And then I know that Financial Freedom, some of my research that I did, that they did have a settlement with the DOJ for $89 million regarding fraud. Is that in the record here? No, it isn't. Okay. But it was just things that I picked up lately. So that said, again, I ask that the court reverse and remand the decision in the lower court so we have a chance to have a trial in front of both jurors and the jury. Thank you. Thank you. I want to thank both counsel for extraordinary arguments this morning on what is a difficult case. There will be a written decision issued in due course, and we are in recess for the balance of the day. Thank you both very much.